**NOT RECOMMENDED FOR PUBLICATION**
File Name: 13a0818n.06

**Nos. 11-1843, 11-2163, 11-2450, 11-2055**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED**<br>Sep 09, 2013<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| SEAN DONOVAN, ROBERT FLOWERS, | ) | MICHIGAN |
| JOHNNY JARRELL, and LEONARD MOORE, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

Before:  SILER, GIBBONS, and GRIFFIN, Circuit Judges.

**SILER**, Circuit Judge.  Leonard "Bo" Moore, Sean Donovan, Robert Flowers, and Johnny Jarrell, members of the Highwaymen Motorcycle Club ("HMC"), were charged and convicted of numerous crimes including violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); RICO conspiracy, 18 U.S.C. § 1962(d); violations of the Violent Crimes in Aid of Racketeering Act ("VICAR"), 18 U.S.C. § 1959(a)(3); drug conspiracy, 21 U.S.C. §§ 841 and 846; conspiracy to transport stolen motorcycles, 18 U.S.C. §§ 2313 and 371; and illegal use of firearms, 18 U.S.C. § 924(c).  They appeal their convictions and resulting sentences, arguing numerous errors by the district court during the trial, pre-sentencing, and sentencing phases.  For the following reasons, we **AFFIRM IN PART**, **REVERSE IN PART**, and **REMAND** for further proceedings.

**I.**

HMC is a multi-state organization with its national headquarters located in Detroit, Michigan. In its prime, HMC included approximately ten chapters, mostly in and around Detroit. The Detroit chapter served as national headquarters and its president served as HMC's highest-ranking member. Each chapter, with its own officers and internal leadership structure, operated within the hierarchy of the organization as a whole.

HMC members were required to pay weekly dues and many met their obligations by selling drugs. One of HMC's drug dealers was Bobby Burton who both sold cocaine to and purchased it from other HMC members (the "Burton conspiracy"). Flowers and Donovan supplied Burton with cocaine and also sold cocaine directly to Burton's distributors when his supply was low.

Aref Nagi, another HMC drug dealer, who primarily sold marijuana and cocaine, relied on Jarrell and Moore to distribute his drugs within HMC generally (the "Nagi conspiracy"), and he also distributed drugs to Flowers, who then redistributed them to the HMC West Side chapter. On numerous occasions, the FBI recorded telephone conversations in which Nagi, Jarrell, and Moore discussed the sale and purchase of drugs. At trial, several HMC members testified generally regarding the Nagi conspiracy and specifically that Moore distributed drugs in connection with the conspiracy. One HMC member, Gerald Peters, specifically recalled seeing Moore share marijuana with other members in the HMC clubhouse. Recorded phone calls also revealed discussions of Moore's small marijuana purchases from Jarrell and his delivery of small amounts of cocaine to Nagi.

In addition to trafficking drugs, some HMC members stole motorcycles while attending out-of-town events, transported them back to Detroit for reassembly, and sold them for income. Moore regularly participated in this scheme, including his assisting HMC in stealing motorcycles with a combined estimated value of $463,000 during a trip to Myrtle Beach, South Carolina. Jarrell and Moore regularly generated income this way and the FBI eventually recovered stolen motorcycles from both of their homes.

When drug debts were left unpaid or when persons were suspected of exposing HMC's involvement in theft, members became violent. On one such occasion, HMC members threatened to kill Alan Kirchoff for failing to pay for a purchase. Kirchoff contacted the police and provided a written statement detailing the events. Later, Moore warned Kirchoff that if he went to the police, Moore couldn't promise that he wouldn't "get hurt and hurt bad." On another occasion, when Moore thought that someone had exposed him to the police for his involvement with stolen motorcycles, he confronted the man at a bar, attacked him with a chair, and beat him up. Perhaps one of HMC's most notable violent performances resulted from an encounter with one of Moore's childhood enemies. Moore and other HMC members confronted Charles Walker outside of a bar and beat him to the ground. As Walker was being beaten, he heard gunshots and quickly ran to his uncle's house a few blocks away. Once inside, Walker received a phone call from Moore who threatened to "come shoot his house up." That night, trucks approached the house and HMC members fired fifteen rounds into the residence. Following the shooting, Moore continued to threaten Walker and other HMC members grew nervous that Moore's erratic behavior would attract the attention of law enforcement.

The FBI's entire investigation of HMC included accounts of these incidents, over 60 executed search warrants, and thousands of wiretaps. In 2009, the United States filed its Second Superseding Indictment against 43 individuals, including Defendants, alleging acts of racketeering, drug possession and trafficking, conspiracy, assault, firearm possession, and obstruction of justice. Defendants proceeded to a jury trial during which several HMC members, who had cooperated with the FBI, testified against them and provided detailed accounts of criminal activity within HMC. For example, Burton testified to purchasing cocaine "a couple ounces" at a time from Donovan on roughly 20 occasions. However, on cross-examination, he noted that his inclusion of Donovan had been an afterthought. HMC member Gerald Peters testified that he heard from another member that Donovan sold cocaine. He also testified that he had never witnessed any of these transactions firsthand. Another HMC member, William Bridges, testified that he and another HMC member traveled to Donovan's home to purchase cocaine and, while he later saw the cocaine that had presumably been purchased, he did not witness the transaction firsthand. HMC member Louis Fitzner also testified regarding numerous acts of thievery and drug trafficking, including his purchase of marijuana from Flowers.

Moore was convicted of violating RICO (Count 1), RICO conspiracy (Count 2), VICAR in relation to the Walker assault (Count 9), conspiracy to transport stolen property (Count 15), conspiracy to distribute controlled substances (Count 19), and use of a gun in relation to his VICAR violation (Count 33). Jarrell and Flowers were both convicted of conspiracy to violate RICO (Count 2) and conspiracy to possess with intent to distribute controlled substances (Count 19). Donovan

was convicted of conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841 and

846 (Count 17).

## II.

### A. Leonard "Bo" Moore.

Moore alleges the following errors on appeal: (1) the district court erred in denying his

request for a jury instruction and special verdict form requiring the finding of a drug type and

quantity for the conspiracy charge; (2) he was sentenced above the maximum punishment for

conspiracy to distribute controlled substances because Viagra is not a controlled substance; (3)

insufficiency of the evidence; (4) the district court gave an improper instruction on aiding and

abetting; (5) inconsistent and prejudicial testimony was admitted and the district court denied

Moore's request for an instruction on the use of such evidence; and (6) the district court

miscalculated the Sentencing Guidelines and sentenced Moore for a discharged firearm which was

not charged in the indictment or decided by the jury. Moore requests that his convictions on all

counts, except for Count 15, be vacated and dismissed or, in the alternative, that they be vacated and

remanded for a new trial or resentencing. The United States concedes that this court should grant

a limited remand to reduce Moore's sentence on Count 19 to the generic statutory maximum for

marijuana under 21 U.S.C. § 841(b)(1)(D). Otherwise, the United States insists that Moore's

arguments lack merit.

### 1. Jury instructions.

We must first determine whether the district court erroneously denied Moore's request for

an instruction and special verdict form requiring a finding on drug type and quantity for the charges

of drug conspiracy and racketeering. Because Moore did not object to the jury instruction that produced a general verdict at his trial, his claim is reviewed for plain error. *See United States v. Olano*, 507 U.S. 725, 731 (1993). Under plain error, reversal is proper only if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 732.

Citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), Moore argues that because issues which increase the maximum penalty for a crime must be proven beyond a reasonable doubt, the district court should have granted his request for an instruction and special verdict form regarding drug type and quantity and its failure to do so is grounds for reversal of his convictions. Although *Apprendi* does prescribe that the failure to instruct a jury to determine both the type of drug and the drug quantity involved amounts to plain error, we must still find that the error seriously affected the fairness, integrity, or public reputation of judicial proceedings before reversal is proper. *United States v. Cleaves*, 299 F.3d 564, 568-69 (6th Cir. 2002).

At trial, the evidence presented regarding the type and quantity of drugs involved was overwhelming. First, although it erroneously listed Viagra as a controlled substance, Count 19 of the indictment clearly indicates which drugs were involved in the conspiracy. Second, the district court determined the specific quantities of drugs involved during the separate, yet related, trial of other HMC members. Evidence of these substances was plentiful and showed that Moore was a high-ranking member of the Nagi conspiracy in which he sold large amounts of marijuana and was also involved in cocaine sales. Third, the evidence presented against Moore focused primarily on marijuana and, to a lesser degree, cocaine. In fact, Moore cites no specific instance during trial when he was linked to trafficking Viagra. It is nearly impossible to accept that a rational factfinder would

have convicted Moore for his involvement in a conspiracy involving Viagra. For these reasons, Moore cannot establish that the instructional error warrants reversal of his conviction.

Moore also argues that the singular reference to "the controlled substance" in the jury instructions suggested that the jury only needed to find a conspiracy to distribute one of the controlled substances in the district court's listed substances which included cocaine, marijuana, steroids, Vicodin, Ecstacy, and Viagra. Again, as the evidence presented against him at trial focused overwhelmingly on his involvement with marijuana and, to some extent, cocaine, the instructions did not seriously affect the fairness, integrity, or public reputation of judicial proceedings, and they do not warrant reversal of Moore's conviction.

### 2. Viagra as a controlled substance.

Because Viagra is not a controlled substance, it may not be the object of a drug conspiracy under 21 U.S.C. §§ 841 and 846. To the extent that the jury instructions stated otherwise, they were incorrect. Moore did not object to the instructions in this regard, so we also review them for plain error. *United States v. Castano*, 543 F.3d 826, 833 (6th Cir. 2008).

In *Hedgpeth v. Pulido*, the Supreme Court rejected a rule requiring reversal in cases like the instant one, where the jury was "instructed on multiple theories of guilt, one of which was improper." 555 U.S. 57, 61 (2008). Instead, the Court held that such errors are subject to the same type of harmless error analysis as other instructional errors. *Id*. (citing *Neder v. United States*, 527 U.S. 1, 11(1999)). We must therefore determine whether the erroneous instruction amounts to harmless error.

Although the jury instructions incorrectly stated that Viagra is a controlled substance, they also correctly stated that marijuana, cocaine, ecstacy, and Vicodin are controlled substances. Thus, if the jury convicted Moore of conspiring to distribute any of these, his conviction should stand. Under this analysis, Moore's argument fails because, as explained above, he was not implicated by the evidence presented at trial regarding Viagra. He does not identify one instance at trial where evidence connected him to the trafficking of Viagra. Rather, evidence concerning Moore's participation in the Nagi conspiracy focused only on marijuana and cocaine. For these reasons, the instruction, while erroneous, does not warrant reversal of his convictions.

Nevertheless, Moore should be resentenced on Count 19 employing a five-year statutory maximum sentence. The evidence presented against Moore focused overwhelmingly on marijuana and, to a lesser degree, cocaine. A defendant may not be sentenced under the statutory penalties for a cocaine conspiracy following a general jury verdict on a conspiracy to distribute both cocaine and marijuana as the jury may have found only a marijuana conspiracy. *United States v. Dale*, 178 F.3d 429 (6th Cir. 1999). This is because the maximum statutory sentence for conspiring to distribute a controlled substance depends on the substance being distributed. 21 U.S.C. § 846. In the case of a general verdict, this information is lacking, and the district court may not impose a sentence exceeding the shortest maximum sentence for any one of the pertinent violations. *Dale*, 178 F.3d at 432. Therefore, Moore should be resentenced applying a statutory maximum of five years pursuant to 21 U.S.C. § 841(b)(1)(D). The United States agrees that resentencing in this narrow regard is proper.

**3. Moore's motions for re-trial or judgment of acquittal.**

Moore next argues that the district court erroneously denied his motions for a new trial or judgment of acquittal on all counts of his convictions, except for Count 15. A denial of a motion for a judgment of acquittal based upon the insufficiency of evidence presented is reviewed *de novo*. *United States v. Morales*, 687 F.3d 697, 700 (6th Cir. 2012). Thus, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of Moore's crimes beyond a reasonable doubt. *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007).

**a. Conspiracy conviction**.

Moore first challenges the weight and sufficiency of evidence supporting his conviction for a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846. Evidence was presented that Moore was part of a "tight crew" in the Nagi conspiracy which involved mostly marijuana trafficking. Although his involvement in the "crew" could have indicated a mere superficial relationship with Nagi without involvement in the drug business, a rational factfinder could have concluded otherwise because of the evidence presented of his particular involvement in these activities. Moore threatened Kirchoff and pressured him to pay his "dope bill." He also intimidated him into keeping quiet about their dealings and interactions. His conviction should therefore stand.

**b. RICO and RICO conspiracy convictions.**

Moore next challenges the weight and sufficiency of evidence supporting his RICO conviction in violation of 18 U.S.C. §§ 1962(c) and 1963(a). To establish a RICO violation, the

government must prove (1) the existence of an enterprise affecting interstate commerce; (2) the defendant's association with the enterprise; (3) the defendant's participation in the conduct of the enterprise's affairs; and (4) a connection between the participation and a pattern of racketeering activity. *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008). Moore argues that the third and fourth elements were not satisfied. In order to meet these elements, the United States must have proven that Moore participated in the operation or management of the enterprise either by making decisions on behalf of the enterprise or knowingly carrying them out, and that he completed a minimum of two predicate acts within a ten-year period in furtherance of the enterprise. *Id*. at 419; 18 U.S.C. § 1961(5).

Ample evidence of Moore's participation and pattern thereof was presented at trial. He led other HMC members in stealing motorcycles on a visit to Myrtle Beach, which benefitted several HMC leaders. In addition, his role in the Nagi conspiracy demonstrated sufficient involvement in HMC's organized drug-trafficking affairs, as he carefully planned and implemented theft and drug schemes. These facts support Moore's substantive RICO convictions.

Moore's RICO conspiracy conviction is also supported by the evidence presented at trial. To sustain a conviction for conspiracy to violate RICO, the United States must prove that a defendant entered into an agreement to violate RICO. 18 U.S.C. § 1961. This showing requires proof that the defendant intended to further the endeavor which, if successfully completed, would satisfy all the elements of an underlying RICO violation. *Fowler*, 535 F.3d at 421. Particular to this appeal, the United States must prove that Moore agreed that he or someone else would commit two

predicate acts in furtherance of the criminal endeavor. *United States v. Driver*, 535 F.3d 424, 432 (6th Cir. 2008).

Moore's RICO conspiracy conviction is premised upon two predicate acts, Racketeering Acts 8 and 11. He challenges the latter of these two, which alleges that he knowingly and intentionally agreed to "distribute more than five kilograms of cocaine, as well as marijuana, Vicoden, Viagra, Ecstacy, and other controlled substances." Evidence at trial discussed above sufficiently established that Moore distributed drugs for Nagi and assisted him in collecting outstanding drug debts from purchasers. Recorded telephone conversations captured Moore's discussing sales of marijuana and deliveries of cocaine. These facts support his conviction for RICO conspiracy.

### c. Assault with a dangerous weapon in aid of racketeering and aiding and abetting of the same (Count 9).

For his connection to the Walker incident, Moore was convicted of assault with a dangerous weapon in aid of racketeering and aiding and abetting assault with a dangerous weapon in aid of racketeering pursuant to 18 U.S.C. §§ 1959(a)(3) and (2), and Mich. Comp. Laws §§ 750.82 and 767.39. He challenges his participation in the underlying assault, as well as the finding that he knew his accomplices were armed with a dangerous weapon. The lynchpin of his argument is that no witness testified to seeing him with a weapon during the incident. However, and as he concedes, actual possession of a firearm is not required for accomplice liability. *See Rattigan v. United States*, 151 F.3d 551, 557 (6th Cir. 1998). As long as he was a willing participant, and he knew that others were armed, his conviction should stand. The evidence speaks clearly on this point. Walker testified that Moore participated in the assault and his uncle similarly recalled seeing Moore at the bar where

the shooting had occurred, as he identified Moore to police as one of the perpetrators. On that same day, a recorded telephone conversation revealed Moore's willingness to assist with the assault and suggested he had weapons readily available for use. These facts are sufficient to support the conviction on Count 9.

**d. Use of a firearm during and in relation to a crime of violence, and aiding and abetting of the same, in violation of 18 U.S.C. §§ 924 (c) and 2 (Count 33).**

For his involvement in the Walker shooting, Moore was convicted of using a firearm during and in relation to a crime of violence. The district court omitted the term "carry" from its instruction to the jury and instead instructed the jury solely regarding "use." Moore argues that this omission renders the instructions "as a whole so clearly erroneous as to likely produce a grave miscarriage of justice."

Section 924(c) establishes penalties for the use *or* carrying of a firearm in furtherance of a violent crime. Thus, § 924(c) may apply in cases where either use or carrying is present. Here, the indictment correctly mentioned both options, yet the jury instructions defined only "use," and not "carrying." However, the instructions limited the charge against Moore to "*using* a firearm" in connection with the Walker shooting. The narrowing of the jury instruction in this regard is permissible, despite that the word "carry" was not stricken from the indictment. *See United States v. Miller*, 471 U.S. 130, 136-37 (1985).

The five-year mandatory minimum sentence for using a firearm in relation to a violent crime increases to ten years if a firearm is discharged. 18 U.S.C. § 924(c)(1)(A)(iii). At sentencing, the district court exercised its discretion under *Harris v. United States*, 536 U.S. 545 (2002), to find that

Moore had in fact discharged a firearm and therefore applied a ten-year mandatory minimum sentence. Moore argues that because the element of discharging affects the statutorily prescribed range of permissible sentences, it must be decided by a jury. At the time of this appeal, Moore's argument plainly contradicted the Supreme Court's holding on this issue in *Harris*, 536 U.S. at 557, which allowed judicial factfinding which would increase a mandatory minimum sentence. Since the parties submitted their briefs, however, the Supreme Court has expressly overruled *Harris* and held that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013). Here, because the district court, rather than a jury, found discharging of the firearm, Moore's sentence for violation of § 924(c)(1)(A) must be vacated and remanded for resentencing consistent with the jury's verdict.

**4. Whether criminal intent is an essential element of aiding and abetting.**

Moore challenges the district court's instruction to the jury regarding the element of intent necessary to impose aiding and abetting liability. Moore did not object to this error, so we review it for plain error. *United States v. Katuramu*, 174 F. App'x 272, 278 (6th Cir. 2006). Jury instructions are viewed "in the context of the instructions as a whole and the trial record." *United States v. Collins*, 78 F.3d 1021, 1035 (6th Cir. 1996) (citation omitted).

The district court instructed the jury as follows regarding aiding and abetting:

> Anyone who intentionally assists someone else in committing a crime is as guilty as the person who directly commits it and can be convicted of that crime as an aider and abettor.

> To prove that a defendant acted as an aider and abettor, the following elements must be proved beyond a reasonable doubt.

> One, that the alleged crime was actually committed.
>
> Two, that before or during the crime, the defendant did something to assist in the commission of the crime.
>
> Three, that the defendant *must have intended the commission of the crime or must have known that the other person intended its commission at the time of giving the assistance*.

(R. 2067 at PAGE ID #14523) (emphasis added). The instructions mirror those for aiding and abetting under Michigan state law. *Cf. People v. Moore*, 679 N.W.2d 41, 49 (Mich. 2004). Moore argues that this definition produced a miscarriage of justice because it omits the element of intent and because it fails to distinguish between the role of a spectator, which does not amount to aiding and abetting, and that of a participant, which does. However, he does not elaborate on this argument or provide any support thereof. He also fails to acknowledge that the jury instructions included the following: "Anyone *who intentionally assists* someone else in committing a crime is as guilty as the person who directly commits it and can be convicted of that crime as an aider and abetter." Although the jury instructions were short of perfect,[1] they did not rise to the level of reversible error because they indeed instructed the jury twice that Moore must have acted intentionally in order to be convicted. Therefore, the instructions are not plainly erroneous.

**5. Evidence of other acts.**

Officer Brooks testified that Donald Megdanoff, Walker's uncle, identified Moore to police as the perpetrator. Moore objected to this testimony because Megdanoff had testified himself at trial

---

[1] It is puzzling that the district court modeled its aiding and abetting instruction on state law. Federal aiding and abetting instructions are readily available and routinely given. See *Sixth Circuit Pattern Jury Instructions*, § 4.01 Aiding and Abetting.

- 14 -

to being unable to identify any shooters. However, Megdanoff had also specifically testified that Moore "took a couple of steps toward [him] and he said, 'You f**** want some of this too?'" Based on this testimony, the district court permitted Brooks's testimony pursuant to Federal Rule of Evidence 801(d)(1)(C), which allows admission of an out-of-court statement identifying a person as someone the declarant perceived earlier as long as "the declarant testifies and is subject to cross-examination."

We review evidentiary rulings for abuse of discretion. *United States v. Bonds*, 12 F.3d 540, 554 (6th Cir. 1993). Because admissibility pursuant to Federal Rule of Evidence 801(d)(1)(C) does not turn on whether the declarant's trial testimony is consistent with his prior statement, the district court did not abuse its discretion in allowing Brooks's testimony. Furthermore, and despite Moore's argument to the contrary, the district court properly ruled that a limiting instruction on its use solely for impeachment was unnecessary as statements of prior identifications are admissible as substantive evidence. *United States v. Lopez*, 271 F.3d 472, 485 (3d Cir. 2001) (*quoting* Fed. R. Evid. 801 advisory committee's note). Therefore, Moore's argument on this point fails.

Moore also challenges the district court's admission of a recorded phone call between Moore and Nagi. During the recording, Moore described beating an unidentified person in a bar fight. Moore argues that the assault was irrelevant to any of the offenses of which he was convicted and served no purpose other than to establish his propensity for violence. This argument fails because the recording, while prejudicial, was probative evidence of Moore's involvement in the RICO and VICAR enterprises as it demonstrated that he employed violent tactics to further the objectives of the enterprise. *See United States v. Garland*, 320 F. App'x 295, 305 (6th Cir. 2008). For this reason,

the district court did not abuse its discretion in admitting this evidence. Moore asserts similar arguments regarding the district court's admission of 27 firearms seized from Nagi's residence and graphic photos of facial injuries to Gerald Deese, who was assaulted by another HMC member. Like the recorded phone conversation between Moore and Nagi, these items were probative evidence of an enterprise that used violence to further its objectives. The district court did not abuse its discretion in admitting them at trial.

Finally, Moore challenges the admission of Burnett's testimony concerning selling cocaine for Burton and having seen Nagi, Moore, and Jarrell go out together on one occasion to collect a drug debt from someone. Moore argues that a proper foundation for this testimony was lacking because Burnett did not participate in the Nagi conspiracy and admitted that he did not know who precisely in HMC was dealing drugs with whom. However, Moore fails to mention that Burnett continued on in his testimony to state that he had discussions with Nagi about his drug activity and had witnessed Nagi's conversations with other HMC members about their organized drug activities. Therefore, while Moore presents factually valid points, the district court did not abuse its discretion in permitting Burnett's testimony because it was soundly supported by his own knowledge of events.

**6. Guidelines calculation.**

Moore argues that the district court erroneously calculated his Guidelines sentence by applying certain enhancements and by rejecting an offense-level reduction. Challenges to the procedural or substantive reasonableness of a sentence are reviewed for abuse of discretion. *United States v. Bolds*, 511 F.3d 568, 578-81 (6th Cir. 2007). To the extent that sentencing challenges

concern factual determinations, we review them for clear error. *Id*. at 579. Legal conclusions are reviewed *de novo*. *Id*.

Moore first challenges the district court's 12-level enhancement and 2-level enhancement pursuant to USSG §§ 2B1.1(b)(1) and (2) for the amount of loss resulting from HMC's motorcycle-theft activities. To successfully challenge the district court's loss-calculation, Moore must demonstrate "that the court's evaluation of the loss was not only inexact but outside the universe of acceptable computations." *United States v. Martinez*, 588 F.3d 301, 326 (6th Cir. 2009) (internal quotation marks and citations omitted). Moore cannot meet this requirement because the district court estimated the total loss as between $200,000 and $400,000, which is conservative based upon the testimony of Neil Wisner, an investigator for the National Insurance Crime Bureau, who estimated that the total value of the motorcycles stolen in South Carolina was $463,000. Therefore, the district court's estimate of total loss falls well within the universe of acceptable computations.

Moore also challenges the district court's application of a 2-level enhancement pursuant to USSG § 2B1.1(b)(4) for being in the business of receiving and selling stolen property. We have affirmed the application of this enhancement where evidence establishes that a defendant deals in stolen merchandise by assisting in the process of obtaining and sorting items and then preparing them for resale. *See United States v. Abdelsalam*, 311 F. App'x 832, 843 (6th Cir. 2009). Because evidence was presented that Moore coordinated efforts to steal numerous motorcycles, store them, and ultimately resell them, the enhancement was correctly applied.

Finally, Moore challenges the district court's decision not to apply an offense-level reduction pursuant to USSG § 3B1.2 for his mitigating role in the charged offenses. However, at sentencing,

Moore agreed that a sentencing reduction pursuant to § 3B1.2 was inappropriate. His argument was therefore waived and should not be considered on appeal. *See United States v. Ward*, 506 F.3d 468, 477 (6th Cir. 2007).

**B. Johnny Jarrell.**

**1. Inclusion of Viagra as a "controlled substance."**

Jarrell correctly asserts that, for the same reasons articulated by Moore and discussed above in Part II.A.2., the district court improperly sentenced him above the maximum sentence for his offense. As with Moore's charges, the jury was erroneously instructed on Jarrell's drug conspiracy charge that Viagra is a controlled substance. As Jarrell's sentencing calculation depended upon the types and quantities of drugs supporting his conviction, the jury should have been instructed to return a special verdict to this effect. Because it was not, the district court erred in imposing a sentence which exceeded the shortest maximum sentence for any one of the pertinent violations. *Dale*, 178 F.3d at 432. Jarrell should therefore be resentenced applying a statutory maximum of five years pursuant to 21 U.S.C. § 841(b)(1)(D). The United States agrees that resentencing in this regard is proper.

**2. Points for leadership role in conspiracy.**

Jarrell also appeals the district court's application of a four-point enhancement for his leadership position in the drug-distribution conspiracy. *See* USSG § 3B1.1. "[R]eview of the legal conclusion that a person is an organizer or leader under Section 3B1.1 . . . is deferential." *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013). To qualify for a leadership-role sentencing enhancement, a "defendant need only organize, supervise, or lead one other participant." *United*

*States v. Currier*, 473 F. App'x 469, 474 (6th Cir. 2012). Factors to consider in this analysis include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruit of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id*. at 474 (quoting USSG § 3B1.1).

At trial, evidence was presented that Jarrell served as president of HMC's Detroit chapter one of the organization's highest-ranking positions and that he sat on HMC's national committee. He also operated as a distributor of Nagi's marijuana within HMC and led efforts to pilfer unlocked motorcycles around Detroit. Considered in their entirety, these facts provide ample support for the district court's application of a sentencing enhancement for Jarrell's leadership role within HMC.

### 3. Quantity of marijuana relied upon at sentencing.

Jarrell argues that the district court erred when it determined that he was accountable for 92.89 kilograms of marijuana because the evidence presented at trial only connected him with 20 pounds of marijuana. In the earlier trial of Nagi, Jarrell's marijuana supplier, the court established that the Nagi conspiracy had distributed 92.89 kilograms of marijuana. As we have recognized, "a district court is indeed permitted to rely on testimony presented in a related proceeding, so long as there are sufficient indicia of reliability." *Logan v. United States*, 208 F.3d 541, 544 (6th Cir. 2000). Jarrell does not challenge the district court's determination during Nagi's trial of the quantity of marijuana involved or point to any specific testimony which may have contaminated this finding.

For this reason, we affirm the district court's determination that Jarrell is responsible for the entire amount of marijuana attributable to the Nagi conspiracy as determined in an earlier trial.

**4. Whether sufficient evidence was presented to support Jarrell's conviction for conspiracy to possess with intent to distribute controlled substances.**

To prove possession of a controlled substance with intent to distribute, the United States must show that a defendant knowingly possessed a controlled substance with intent to distribute it. *United States v. Bennett*, 291 F.3d 888, 895 (6th Cir. 2002). To establish a drug conspiracy, the United States must prove that a defendant entered into an agreement to engage in unlawful behavior, had knowledge and intent to join the conspiracy, and participated in the conspiracy. *United States v. Morrison*, 220 F. App'x 389, 392 (6th Cir. 2007).

Jarrell contends that his conviction must be set aside because the evidence was insufficient to establish that he "entered into an agreement to violate drug laws or that he had the knowledge and intent to join a drug conspiracy." He contends that the only evidence regarding his involvement was Fitzner's testimony that 20 kilograms of marijuana were retrieved from Jarrell's home. Other HMC members testified that Jarrell held a full-time job and was not dependent upon income from drug sales or that they had no actual knowledge of Jarrell's specific role in HMC's drug-distribution scheme. Despite these statements, however, sufficient evidence was presented in support of finding that Jarrell indeed voluntarily and knowingly entered into the conspiracy. For example, his role as a chapter president speaks volumes to his engagement in these activities. Fitzner's testimony about being ordered to pick up marijuana from Jarrell establishes his knowledge and intent to be a

participant. This is consistent with other testimony that Jarrell purchased steroids from other members and that members owed him money for various drug purchases.

**5. Whether sufficient evidence was presented to support Jarrell's conviction for conspiracy to violate RICO.**

To sustain Jarrell's conviction for his conspiracy to violate RICO, the United States must show that he entered into an agreement to violate RICO. 18 U.S.C. § 1961. This showing requires proof that Jarrell intended to further the endeavor which, if successfully completed, would satisfy all the elements of an underlying RICO violation. *Fowler*, 535 F.3d at 421. To prove a RICO violation, the United States must show (1) the existence of an enterprise which affects interstate commerce; (2) the defendant associated with that enterprise; (3) the defendant participated in the conduct of the enterprise's affairs; and (4) the defendant's participation was connected to a pattern of racketeering activity. *Id.* at 418; 18 U.S.C. § 1961; *United States v. Sinto*, 723 F.2d 1250, 1260 (6th Cir. 1983). Jarrell disputes the first and third of these factors, both of which were sufficiently supported by the evidence. First, HMC was clearly an enterprise as evidenced by its ongoing formal and informal organization and by the various criminal activities which were interrelated and planned among its members. *See United States v. Turkette*, 452 U.S. 576, 582-83 (1981). HMC's organized, hierarchical structure provided it with an effective mechanism for directing its affairs, supporting its classification as an enterprise. Second, ample evidence supports the finding that Jarrell agreed to participate in the enterprise's conduct with knowledge and intent that other HMC members would commit at least two predicate acts in furtherance of the enterprise, as required for his conviction. *See United States v. Nguyen*, 255 F.3d 1335, 1341 (11th Cir. 2001). Jarrell served as the Detroit

chapter president, one of HMC's highest-ranking members in the country, and he sat on the organization's national committee. Evidence was presented that he conspired to distribute controlled substances with Moore and others as part of the Nagi conspiracy. Additional evidence indicated that he had knowledge of HMC's motorcycle thefts, as he allowed Moore to store at least one stolen motorcycle in their shared condo.

### C. Robert Flowers.

Flowers was convicted of conspiracy to violate RICO and conspiracy to distribute controlled substances. He challenges these convictions and argues specifically that (1) his RICO conspiracy conviction, for violation of 18 U.S.C. § 1962(c) should be vacated because the evidence could not establish his agreement that someone would commit two predicate acts; and (2) the evidence did not establish his agreement to distribute controlled substances in violation of 21 U.S.C. § 846.

These arguments fail because the evidence showed that, as a leader within HMC, Flowers participated in the Burton conspiracy. He picked up a shipment of cocaine and delivered it to Burton's house. Fitzner testified that Flowers dealt drugs from the HMC West Side chapter clubhouse. These facts establish that he committed acts in furtherance of HMC's RICO violations (he transported drug orders and sold them himself) and that he agreed to others' participation in furthering these activities (he served as a chapter officer and trafficked drugs with other members from the HMC clubhouse). For these reasons, this convictions are sufficiently supported by the evidence.

**D. Sean Donovan.**

Donovan was convicted of conspiring to distribute over five kilograms of cocaine in violation of 21 U.S.C. § 846. He challenges the district court's admission of evidence of his selling cocaine to two HMC members, William Bridges and John McGinn. The United States argues that Donovan failed to preserve this issue for appeal because it was not raised before the district court. Whether Donovan's objection properly preserved his precise grounds for appeal need not be decided, however, since his arguments fail under review for either abuse of discretion or plain error.

Peters testified over Donovan's objection that another HMC member, McGinn, told Peter that Donovan was selling cocaine. On cross-examination, Peters acknowledged that he never firsthand saw Donovan sell cocaine to anyone. Peters's testimony was relevant and did not violate the Confrontation Clause. U.S. Const. amend. VI. Evidence of his repeated cocaine sales to Burton and others was probative of his involvement in the conspiracy. Moreover, Donovan's Sixth Amendment right was not violated because the Confrontation Clause protects defendants against out-of-court testimonial statements which the declarant would reasonably anticipate being used against him. *United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009). The statement in question was not testimonial and therefore does not implicate Donovan's Confrontation Clause rights.

Bridges's testimony was also properly permitted because it was relevant to Donovan's supplying cocaine to members of the Burton conspiracy. Donovan and Bridges were both part of the Burton conspiracy, and Bridges's testimony on this topic was directly probative of Donovan's participation. For these reasons, Donovan's arguments lack merit and should be rejected.

**V. CONCLUSION**

Defendants' convictions are **AFFIRMED**. However, because the sentences for both Moore and Jarrell were tainted by the incorrect categorization of Viagra as a controlled substance, and because the district court improperly applied a ten-year mandatory minimum sentence on Moore's conviction for violating 18 U.S.C. § 924(c)(1)(A), their sentences are **REVERSED** and **REMANDED** to the district court for re-sentencing consistent with this opinion.